IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MCGRIFF INSURANCE                )
SERVICES, LLC,                   )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          1:23-CV-295
                                 )
CHRISTOPHER WILSON,              )
                                 )
            Defendant.           )

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

McGriff Insurance Services, LLC, has sued Christopher Wilson, one of its former vice presidents, alleging breach of contract, breach of the duty of loyalty, conversion, misappropriation of trade secrets, and other related claims. McGriff moves for summary judgment on six of its seven claims and seeks leave to amend its complaint to assert a claim under the Georgia Trade Secrets Act. Mr. Wilson opposes the motion to amend and moves for summary judgment on all claims.

The undisputed facts show that Mr. Wilson breached his employment contract by soliciting many customers and employees to leave McGriff and move with him to a competitor and by sharing some of McGriff's confidential information concerning customers. To this extent, McGriff is entitled to partial summary judgment on its breach of contract claims. And McGriff does not challenge that Mr. Wilson is entitled to summary judgment on its conversion claim. The cross-motions for summary judgment are otherwise denied; there are disputed questions of fact material to remaining claims.

The motion to amend will be denied. McGriff has not shown good cause for the late amendment nor is amendment necessary as McGriff can pursue its North Carolina statutory misappropriation of trade secrets claim.

## I.    Undisputed Facts

McGriff, a North Carolina limited liability company, Doc. 35-10 at ¶ 4, is an independent insurance broker that connects its customers to insurance carriers offering policies to those customers. *See id.* at ¶¶ 2, 7. As part of its business, McGriff maintains formal relationships with insurance carriers. *Id.* at ¶ 7. These relationships are referred to as "appointments," and the carriers are often referred to as "markets." *Id.* Insurance agents at McGriff are called "producers;" a producer develops new customers and maintains relationships with existing customers. *Id.* at ¶ 5; *see also* Doc. 35-2 at 17–18, 24–25, 31[1] (testimony that producers work in a relationship business). When a customer buys a policy from an insurer through McGriff, McGriff receives part of the annual premium, both when the policy is written and each time it is renewed. Doc. 35-10 at ¶ 8.

Mr. Wilson lives in Macon, Georgia. Doc. 35-2 at 12. In 2004, he began work as a "producer" for McGriff's predecessor in the Macon office, selling insurance policies. [2] *Id.* at 15; Doc. 39-4 at ¶ 3. As Mr. Wilson acquired a larger book of business, his job title

---

[1] Except where specifically noted, the Court has used the pagination used by the court reporters transcribing depositions for all citations to deposition testimony. For all other citations, the pagination appended by the CM/ECF system is used.

[2] Mr. Wilson began with BB&T Insurance. Doc. 35-2 at 15; Doc. 39-4 at ¶ 3. In 2018, BB&T Insurance changed its name to McGriff Insurance Services, Doc. 39-2 at 13–14; Doc. 35-11 at 2, and Mr. Wilson continued to work for the company. Doc. 35-2 at 15; Doc. 39-4 at ¶ 8.

2

changed but he continued to be a producer. Doc. 35-2 at 18. By 2022, he was a Vice President and Business Insurance Agent at McGriff. *See id.* at 15, 18; Doc. 35-10 at ¶ 5. In 2021, he brought in approximately $1.3 million in revenue. Doc. 35-2 at 30.

Mr. Wilson signed an employment agreement with McGriff's predecessor in 2010.[3] Doc. 35-13; Doc. 39-4 at ¶ 4. The agreement contained an employee non-solicitation provision, Doc. 35-13 at p. 8 ¶ 8(a)(i), a customer non-solicitation provision, *id.* at p. 8 ¶ 8(a)(iii), and a confidentiality provision. *Id.* at pp. 9–10 ¶ 11.

The non-solicitation provisions applied during Mr. Wilson's employment and for two years after employment ends. *Id.* at p. 8 ¶ 8. The confidentiality provision applied during his employment and for three years after employment ends. *Id.* at p. 9 ¶ 11.

Paragraph 17 of the agreement states that "[t]he validity, performance, construction and effect of this Agreement shall be governed by the substantive laws of the State of North Carolina, without regard to the provisions for choice of law thereunder." *Id.* at p. 12 ¶ 17. Trade secrets are protected "under applicable law." *Id.* at p. 10 ¶ 11(a). The contract also provides that any action arising out of the agreement must be brought in state court in Forsyth County, North Carolina, or the United States District Court for the Middle District of North Carolina. *Id.* at p. 12 ¶ 17.

---

[3] The employment agreement refers to BB&T Insurance. *See* Doc. 35-13. Mr. Wilson does not challenge that BB&T restructured to become McGriff. *See* Doc. 35-11 (Articles of Amendment changing name of BB&T Insurance Services, Inc. to McGriff Insurance Services, Inc.). He does contend that he agreed not to recruit BB&T employees, not McGriff employees, and that McGriff has not shown Mr. Wilson recruited any employees of BB&T. *See* Doc. 43 at 12–13. This contention is addressed *infra* at 10–15.

3

In February 2022, Mr. Wilson received a letter from John Neel, Chief Executive Officer at The Sanford Company, offering Mr. Wilson a position as a producer at Sanford. Doc. 35-14. Sanford is a competitor of McGriff. *See id.* at 5–6 (offer letter comparing employment at the two companies). Over the next several months, Mr. Wilson planned and prepared to work for Sanford, though he continued to be a McGriff employee; the evidence about the nature and extent of those plans will be discussed *infra*.

Mr. Wilson resigned from McGriff on October 31, 2022. Doc. 37-1; Doc. 35-2 at 15. He immediately went to work at Sanford, Doc. 35-2 at 15, also in Macon, Georgia. *See* Doc. 35-14 at 6; Doc. 39-7 at 13.

On November 1, 2022, Mr. Wilson sent multiple, unsigned Broker of Record (BOR) letters to potential clients, including clients he had at McGriff. Doc. 37-2. A client can use a BOR letter to establish a broker relationship, Doc. 35-1 at 94–95; Doc. 35-10 at ¶ 8, and to inform a former broker if the client has switched brokers. Doc. 35-1 at 94–95. Many of Mr. Wilson's former clients switched from McGriff to Sanford. *Compare* Doc. 39-5 (list of Mr. Wilson's clients at McGriff), *with* Doc. 39-1 at 21–22 (CM/ECF pagination) (McGriff's lost clients during the non-solicitation period).

Additional undisputed facts will be stated as they are relevant to the claims. Where there are factual disputes, those will also be discussed as they become relevant.

## II.    Procedural Background

On March 7, 2023, McGriff sued Mr. Wilson in North Carolina state court, Doc. 1-1 at p. 2, asserting claims of breach of contract, breach of the duty of loyalty, conversion, misappropriation of trade secrets, and unfair and deceptive trade practices. *Id.* at pp. 12–

4

19 ¶¶ 57–110.  Mr. Wilson removed the case to federal court.  Doc. 1.  Discovery has been completed, and the case was set for trial during the November 2024 term.  Text Order 07/30/2024.

McGriff contends that North Carolina law applies to its claims, *see generally* Doc. 35, but Mr. Wilson contends that Georgia law applies.  *See generally* Doc. 39.  On March 29, 2024, McGriff moved to amend its complaint to add a claim under Georgia's Trade Secrets Act.  Doc. 33 at ¶¶ 4–5.  Mr. Wilson contests the motion to amend.  Doc. 41.

Both parties filed motions for summary judgment.  Doc. 34; Doc. 38.  McGriff moves for summary judgment on all claims but the conversion claim.  Doc. 35 at 8–9.  Mr. Wilson moves for summary judgment on all claims.  Doc. 39 at 1–2.  The cross-motions for summary judgment are fully briefed, and on July 23, 2024, the Court held a hearing on all pending motions.  *See* Minute Entry 07/23/2024.

While the motions were pending, Mr. Wilson filed a petition for bankruptcy.  *See* Doc. 49.  The case was stayed.  Doc. 50; *see also* 11 U.S.C. § 362(a)(1).  After the bankruptcy court modified and lifted the stay so that this case may proceed, Doc. 62-2, this Court granted McGriff's motion to reopen the case, lifted the stay, and set this matter for trial during the May 2025 term.  Doc. 65.

### III.  Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When parties submit cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine

whether either of the parties deserves judgment as a matter of law." *Rossignol v.*

*Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (cleaned up); *see also Coalition for TJ v.*

*Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023). For each motion, the court

views the facts in the light most favorable to the party opposing that motion. *Rossignol*,

316 F.3d at 523; *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 574 (D. Md. 2021).

## IV.    Breach of Contract Claims

McGriff contends that Mr. Wilson breached the provisions of the contract

prohibiting non-solicitation of McGriff customers, non-solicitation of McGriff

employees, and disclosure of confidential information. Both parties move for summary

judgment. Mr. Wilson contends Georgia law applies to all breach contract claims because

Georgia has a materially greater interest in the contract and the employee non-solicitation

provision is overbroad and against Georgia public policy. McGriff contends that the

choice of law provision in the contract is valid and thus North Carolina law applies.

### A. Choice of Law

The contract states that North Carolina law governs "[t]he validity, performance,

construction and effect of this Agreement." Doc. 35-13 at p. 12 ¶ 17. Despite this

provision, Mr. Wilson contends that Georgia law governs the breach of contract claims

because Georgia has a materially greater interest in the contract. Doc. 39 at 6–8, 13.

In diversity cases, federal courts apply the forum state's choice of law rules.

*Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 67 F.4th 648, 653 (4th

Cir. 2023). North Carolina courts will enforce a contractual choice of law clause unless:

6

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which ... would be the state of applicable law in the absence of an effective choice of law by the parties.

*Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 642–43, 574 S.E.2d 31, 33–34 (2002).

Mr. Wilson testifies that he accepted his employment offer in Georgia. Doc. 39-4 at ¶¶ 4, 7.[4] It is undisputed that he performed his employment obligations in Georgia, *id.* at ¶ 11, and that most of his McGriff customers were based in Georgia. *Id.* at ¶ 12. Under his employment agreement, he also had to secure and maintain all necessary insurance licenses required by the state of Georgia, Doc. 35-13 at pp. 2–3 ¶ 2(b), and "perform the specific duties of" and "provide the services normally associated with" McGriff through its Macon, Georgia office. *Id.*

But McGriff is headquartered in North Carolina and maintains its bank accounts in North Carolina. Doc. 35-10 at ¶ 4. Payments from Georgia customers are sent to McGriff to be deposited in those accounts. *Id.* There is a substantial relationship between North Carolina and the parties and issues in dispute.

The Court assumes without deciding that Georgia law would apply absent the provision. Even so assuming, Georgia does not have a materially greater interest than

---

[4] McGriff offers evidence disputing this point. *See* Doc. 42-3 at ¶¶ 4–6.

7

North Carolina in the determination of the matter, nor is application of North Carolina law contrary to a fundamental policy of Georgia law.

Georgia has an interest in protecting its employee-residents, controlling the degree of free competition in its local economy, and regulating employment restrictions placed on its residents. *Barnes Grp., Inc. v. C & C Prods., Inc.*, 716 F.2d 1023, 1030 (4th Cir. 1983); *see also Viking Grp., Inc v. Grasser*, No. 22-CV-933, 2023 WL 4824454, at *4 (W.D. Mich. Jan. 19, 2023) (discussing interests of state of employee's residence and employer's headquarters). But North Carolina "has an interest in protecting its companies from breaches of employment agreements." *Id.* at *4; *see also Gay v. CreditInform*, 511 F.3d 369, 390 (3d Cir. 2007) (acknowledging state interest in protecting its businesses). And "[w]hen one of the parties is from a particular state, that state has a serious interest in having its law apply." *Harleysville Mut. Ins. Co. for Carolina Stone Setting Co., Inc. v. Gate Precast Co.*, No. 5-CV-228, 2006 WL 8438619, at *7 (E.D.N.C. Oct. 4, 2006). McGriff is headquartered in North Carolina, Doc. 35-10 at ¶ 4, and Mr. Wilson lives in Georgia. Doc. 35-2 at 12. Both North Carolina and Georgia have serious interests in this matter, and Georgia's interest is not materially greater.

Even if Georgia had a materially greater interest, application of North Carolina law is not contrary to a fundamental policy of Georgia. Under Georgia law, restrictive covenants like employee non-solicitation provisions are only against public policy if they are unreasonable. *See Belt Power, LLC v. Reed*, 354 Ga. App. 289, 296, 840 S.E.2d 765, 771 (2020). The passage of the state's Restrictive Covenants Act in 2011 did not change this policy. *Id.* While the details vary, Georgia law is similar to North Carolina law. *See,*

8

*e.g.*, *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 267, 827 S.E.2d 458, 466 (2019) (stating requirements for North Carolina covenants not to compete including that covenant be reasonable as to "terms, time, and territory"); *see generally Lab'y Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 458–61 (M.D.N.C. 2015) (discussing enforceability of non-solicitation and noncompete restrictive covenants).[5]

The employee non-solicitation provision is not against a fundamental Georgia public policy. And Mr. Wilson has pointed to no fundamental policy in Georgia against enforcing confidentiality agreements between employers and employees or customer non-recruit covenants. North Carolina law applies to the breach of contract claims.

### B. Summary Judgment Discussion

A plaintiff who asserts a breach of contract claim must show "(1) the existence of a valid contract and (2) breach of the terms of the contract." *Wells Fargo Ins. Servs.*, 372 N.C. at 276 (cleaned up). Mr. Wilson contends that even under North Carolina law, the employee non-solicitation provision is unenforceable. He also contends he has not breached it, the customer non-solicitation provision, or the confidentiality provision.

---

[5] Mr. Wilson contends that the Court should only look to pre-2011 case law to determine Georgia's public policy on restrictive covenants. Doc. 39 at 8 n.3. Assuming without deciding that is so, Georgia courts upheld reasonably restrictive covenants in employment agreements before 2011. *See Club Props., Inc. v. Atlanta Offices-Perimeter, Inc.*, 180 Ga. App. 352, 354, 348 S.E.2d 919, 921–22 (1986) (allowing restrictive covenants so long as they were reasonable as to time, geographic reach, and activities prohibited); *Hostetler v. Answerthink, Inc.*, 267 Ga. App. 325, 328, 599 S.E.2d 271, 274 (2004) (holding restrictive covenants enforceable so long as "(1) the restraint is reasonable; (2) founded upon valuable consideration; (3) is reasonably necessary to protect the party in whose favor it is imposed; and (4) does not unduly prejudice the interests of the public"); *Murphree v. Yancey Bros. Co.*, 311 Ga. App. 744, 747–49, 716 S.E.2d 824, 827–28 (2011) (upholding non-solicitation covenant in 2002 employment agreement because it was reasonable as to duration, reach, and prohibitions).

9

### 1. The Employee Non-Solicitation Provision

North Carolina courts enforce "reasonable restrictions on a former employee's right to solicit an employer's current employees." *Id.* at 274. A restrictive covenant is enforceable if it is "(1) in writing; (2) reasonable as to the terms, time, and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." *Id.* at 267 (cleaned up); *see also Lab'y Corp. of Am. Holdings*, 84 F. Supp. 3d at 458 (discussing requirements for restrictive covenants). Whether a restrictive covenant is reasonable and enforceable is a matter of law. *See Sterling Title Co. v. Martin*, 266 N.C. App. 593, 597, 831 S.E.2d 627, 631 (2019).

### a. Scope

A restrictive covenant must be "no more burdensome than is necessary to protect a legitimate business interest of the employer." *Microban Int'l, Ltd. v. Kennedy*, No. 22-CV-620, 2023 WL 2533085, at *4 (W.D.N.C. Mar. 15, 2023); *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 316, 450 S.E.2d 912, 919 (1994). The burden of proving a non-solicitation agreement is enforceable rests on the party seeking enforcement. *Lab'y Corp. of Am. Holdings*, 84 F. Supp. 3d at 458.

The employment agreement here prohibits Mr. Wilson from acts that "directly or indirectly solicit, recruit, encourage, or support any employee of BB&T [McGriff's predecessor] who had performed work for BB&T within the last year of [Mr. Wilson's] employment with BB&T to leave the employment of BB&T." Doc. 35-13 at p. 8 ¶ 8(a) (cleaned up). This restriction runs "for a period of two years following the date of [Mr. Wilson's] termination." *Id.* For reasons persuasively explained by the North Carolina

Business Court in a case involving the same provision, this provision protects a legitimate business interest, is not unduly burdensome, and is not overbroad. *See McGriff Ins. Servs., Inc. v. Ryan Hudson & Digit. Ins., LLC*, No. 22-CV-680, 2023 WL 197441, at *8–10 (N.C. Super. Jan. 17, 2023).

Mr. Wilson points out that the provision only prohibits him from soliciting employees of "BB&T Insurance," Doc. 35-13 at p. 8 ¶ 8(a)(i), and contends he did not agree to "an exponentially wider covenant" covering employees of all businesses acquired by BB&T and its successors "over the following dozen years." Doc. 43 at 12. But he does not challenge the fact that the contract continued to apply to his relationship with McGriff after McGriff took over BB&T's insurance interests.[6] It is undisputed that McGriff has a legitimate interest in protecting all its employees from poaching, and the employee solicitation provision applies only to those employees who worked for the company "within the last year of Mr. Wilson's employment." Doc. 35-13 at p. 8 ¶ 8(a)(i) (cleaned up). This is not overbroad. The employee non-solicitation provision in Mr. Wilson's contract is reasonable and enforceable.

### b. Breach

The evidence, viewed in the light most favorable to Mr. Wilson, shows that Mr. Wilson breached the provision in the employment contract that prohibits him from soliciting, recruiting, encouraging, or supporting employees to leave McGriff. *See id.*

---

[6] The evidence shows that the Chairman of BB&T Insurance Services signed the contract with Mr. Wilson. Doc. 35-13 at 15. BB&T changed its name to McGriff Insurance Services, Inc. in 2018. Doc. 35-11. Thus, BB&T and McGriff are the same, and Mr. Wilson does not contend otherwise.

There is documentary evidence that Mr. Wilson solicited many McGriff employees who now work for Sanford, including Carson Schilling, Jim Wilson, Jimmy Hinson,[7] Josh James, Carrie McKinney,[8] and his assistant Katrina (Trina) Sidlauskas,[9] as well as other employees,[10] and that he identified those employees to Sanford and encouraged Sanford to reach out to them. He also told Sanford that he wanted to work with specific McGriff

---

[7] In a text dated March 12, 2022, Mr. Wilson texted Carson Schilling that he "had a great talk with John and Mike. They will be reaching out to you and Josh this week." Doc. 35-16 at 68 (cleaned up). In the same text thread, he said the "goal is grand slam. Me, you, Josh, Jimmy, Jim Wilson, support staff. Ownership." *Id.* at 70 (cleaned up). Two days later, Mr. Wilson told Sanford to "go ahead and reach out to Carson and Josh … they are expecting it." *Id.* at 54 (cleaned up). In August 2022, Mr. Wilson also texted Jim Wilson about potential employment details at Sanford and told him Mike Kaplan of Sanford would call to set up a meeting. *Id.* at 80. He wrote "talked to Mike. Good on 125. Good on 25 potential bonus … Good on you getting paid if you are involved in bringing a deal to table." *Id.* (cleaned up). Jim Wilson, Jimmy Hinson, Josh James, and Carson Schilling all now work at Sanford. Doc. 35-9 at 11; Doc. 35-8 at 26; Doc. 35-7 at 51; Doc. 35-5 at 12–13.
In his deposition, Mr. Wilson answered several dozen questions about his interactions with these employees by saying "I don't recall," or words to that effect; he never denied the specific interactions otherwise shown by the evidence. *See, e.g.*, Doc. 35-2 at 180–81. He affirmatively testified that he only "recalls" that he, Carson Schilling, Josh James, and Jimmy Hinson discussed their job offers from Sanford and "whether it made sense, the employment package, or whatnot." *Id.* at 180–82. But this is not enough to create a disputed question of material fact as to whether he solicited these three employees to come to work for Sanford while he still worked at McGriff and after he received an offer of employment from Sanford. *See* Doc. 35-14 at 2.

[8] When asked how she learned about potential employment at Sanford, Ms. McKinney testified that "Chris Wilson gave John Neel my name, and John called me." Doc. 43-6 at 18. She further stated that Mr. Wilson repeatedly asked her if she would ever leave McGriff, and she told him that "it would have to be the perfect opportunity." *Id.* at 20–21. Some time passed, then Mr. Wilson told Ms. McKinney to expect a call from Mr. Neel. *Id.* at 21. Ms. McKinney ultimately accepted a job at Sanford. *Id.* at 56.

[9] In a September 6, 2022, text, Mr. Wilson told Sanford to "put something in front of Trina" and that he thought Sanford should reach out to her. Doc. 35-16 at 62. He offered to tell Sanford what the two of them had discussed. *Id.*

[10] Mr. Wilson told Sanford to call Tom Flythe, *see* Doc. 35-16 at 63–64, an employee at McGriff, Doc. 35-2 at 85, and that he was "talking to Wallace and Jessica." Doc. 35-16 at 79. Debbie Wallace and Jessica Foskey were other employees at McGriff. Doc. 35-2 at 85.

12

employees, Doc. 35-2 at 84–85, if certain McGriff employees were unhappy at their current positions, Doc. 35-3 at 31, and that Sanford should recruit McGriff employees he identified. Doc. 35-2 at 171. John Neel, CEO of Sanford, testified that he did not intend to recruit other McGriff employees until Mr. Wilson told him about individuals and offered to introduce Mr. Neel to them. Doc. 35-3 at 31.

Mr. Wilson's efforts to undermine this evidence do not create disputed questions of fact. He quibbles about whether he "solicited" these employees, saying he is not the one to deal with those employees about the job change. *See* Doc. 43 at 13–15. But solicitation is defined more broadly than that and includes active persuasion, not just discussions about the details. *See Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354, 712 S.E.2d 366, 369–70 (2011). To the extent his role was less than solicitation, his conduct still fell within the conduct prohibited by the contract; he makes no effort to show that he did not encourage or support those employees to leave McGriff. Doc. 35-13 at p. 8 ¶ 8(a)(i) (contract provision prohibiting acts that "encourage or support" an employee to leave McGriff).

His other factual assertions are similarly unhelpful to him. For example, he says he never met Carrie McKinney before she left McGriff to work for Sanford so he could not have solicited her. Doc. 43 at 14–15. But in the cited testimony, Ms. McKinney says that while she never met Mr. Wilson in person, Doc. 43-6 at 16, she communicated with him every couple of weeks by phone and email; that after they had a number of general conversations about changing employers, Mr. Wilson told Ms. McKinney that John Neel would be calling her, *id.* at 18–20; and that she and Mr. Wilson talked about going to

13

Sanford while they both had open jobs offers. *Id.* at 24. The fact that they did not meet in person is not material, and whether Mr. Wilson's actions were the cause of Ms. McKinney's job change goes to damages, not breach.

The evidence shows that Mr. Wilson actively persuaded, encouraged, supported and solicited employees of McGriff, specifically Carson Schilling, Jim Wilson, Josh James, Jimmy Hinson, Katrina Sidlauskas, Carrie McKinney, Tom Flythe, Debbie Wallace, and Jessica Foskey, to leave their employment at McGriff in violation of the employee non-solicitation provision in his employment agreement. To this extent, summary judgment on Count II: Breach of Contract – Solicitation of Employees, Doc. 2 at ¶¶ 66–76, will be granted in McGriff's favor. As to all of these solicited employees, only the question of damages is for trial.

McGriff has not established that it is entitled to summary judgment on this claim to the extent it is based on any alleged solicitation of any other McGriff employees. To the extent it so contends, the question of breach will be for trial, as will damages.

### 2. Customer Non-Solicitation Provision

Mr. Wilson's employment agreement prohibits him from soliciting McGriff customers "for a period of two years following the date of termination of [Mr. Wilson's] employment." Doc. 35-13 at p. 8 ¶ 8(a)(iii). Mr. Wilson agreed and promised not to "directly or indirectly solicit, contact, divert, or call upon with the intent of doing business with, any [McGriff] customer on [Mr. Wilson's] own behalf or on behalf of any competitive business." *Id.* (cleaned up).

14

It is undisputed that Sanford is a competitive business as defined by the contract, *see id.* at p. 8 ¶ 8(b)(i), and that the customers at issue are covered by the non-solicitation clause. *See id.* at p. 8 ¶ 8(b)(ii). Mr. Wilson does not challenge the enforceability of the contract provision prohibiting customer solicitation. Thus, the material fact is whether Mr. Wilson directly or indirectly solicited McGriff customers with the intent of doing business with them on behalf of Sanford.

McGriff has presented evidence that Mr. Wilson solicited McGriff customers, both before and after he left McGriff. *See* discussion *infra*. To the extent Mr. Wilson moves for summary judgment on this aspect of McGriff's claim, the motion will be denied.

Indeed, McGriff's evidence, as to almost all of the identified customers, is undisputed. McGriff has offered both direct and indirect evidence, and Mr. Wilson either admits or does not bother to specifically deny these solicitations.

For example, Mr. Wilson testified that he told many of his McGriff customers he was leaving before he moved to Sanford in hopes they would follow him. Doc. 35-2 at 103–10.[11] Months before starting at Sanford, he sent multiple texts to Sanford employees

---

[11] Mr. Wilson testified that he told the following McGriff clients he was leaving: Burgess Pigment Company, Farmview, The ARC Macon, RSDH Andy's Pool, Pyrotechnic, Family Hospice, Fincher's Barbeque, Kelly Products, Arrow Dynamics, Core Management, Economy Tire, Sellers Construction, Sellers Aviation, Gayton Health Center, Kelly Registration Systems, and Macon Tent Rentals. Doc. 35-2 at 103–08; *see also* Doc. 39-1 at 21–22 (CM/ECF pagination).

about establishing relationships with insurance carriers that his McGriff customers used.[12]

In one text sent before he left McGriff, Mr. Wilson stated his intent to "preach" to one customer, Buzzell, about the forms the customer needed to sign to move its business, Doc. 35-16 at 48. In another, he said he had "to be able to BOR" as soon as he left McGriff. Doc. 35-4 at 18. As explained *supra*, a "BOR" is a letter that a customer signs to create an official and exclusive relationship with an insurance broker. *See supra* at 4; *see also* Doc. 35-10 at ¶ 8 (explaining BOR letters as they relate to McGriff).

Mr. Wilson further texted Sanford that he was talking to clients "to clear all paths." Doc. 35-16 at 73. And he sent texts about "moving [an] account," "unofficial appointments" he had "for conversions," and customers that "committed to Sanford" all while he was still working at McGriff. *Id.* at 43, 81, 85. There are many other texts that

---

[12] Specifically, in March 2022, Mr. Wilson texted Sanford that he would "send you guys markets this week." Doc. 35-16 at 54. He then sent Sanford a list of markets some of which included "an account that goes with the market." *Id.* at 55–56. In September 2022, Mr. Wilson texted Sanford a list of McGriff clients and their insurance carriers. Doc. 35-4 at 17–18, 23–24 (CM/ECF pagination). He said he needed "an update on each of these accounts" including information on which markets Sanford did not have. *Id.* at 18.

indicate he solicited customers to come with him when he left for Sanford.[13] And it is undisputed that Mr. Wilson made lists of customers that he hoped to take to Sanford.[14]

On his first day at Sanford, Mr. Wilson sent BOR letters to several of his former McGriff customers, in effect asking those customers to move their business to Sanford. *See* Doc. 37-2.[15] And he made statements to Sanford employees that implied he had talked with someone at Mercer University, one of McGriff's customers, about moving his business. *See* Doc. 35-16 at 91 (telling Sanford employees that a person named Chandler "was supposed to advocate for us to BOR Mercer"); Doc. 39-5 (listing Chandler Wagner as Mr. Wilson's contact for Mercer).

In addition to all of this circumstantial evidence, there is also some direct evidence. Before leaving McGriff, Mr. Wilson told Mac Leskosky of America Swimming Pool Company ("ASP") that he was moving to Sanford, *see* Doc. 39-5; Doc. 35-16 at 111, that he was trying to bring Carrie McKinney, the person who worked on the ASP accounts at McGriff, to Sanford, *see* Doc. 35-16 at 111; Doc. 35-2 at 127, and that

---

[13] In September 2022, Mr. Wilson texted Sanford that he had "just closed Sellers, Burgess, and Pyrotechnics for Sanford. Boom," Doc. 35-16 at 78 (cleaned up), three accounts he had at McGriff. Doc. 39-5. In October 2022, he texted Mike Kaplan of Sanford "AGC…we got them? Have a meeting with Buzzell and just confirming as it was on the list from beginning." Doc. 35-16 at 47. AGC is one of the insurance carriers that Mr. Wilson texted Sanford about in March 2022, *id.* at 55, and Buzzell was one of Mr. Wilson's McGriff customers. Doc. 39-5.

[14] Mr. Wilson made a handwritten list of McGriff clients, revenue, and policy renewal dates, *see* Doc. 36-4, and referred to the list as containing his goals. Doc. 35-2 at 211–13. He also put various lists of McGriff clients on his Sanford office whiteboards, including one titled "Other Accounts to Move," Doc. 36-3 at 2, and another titled "New Clients at Sanford." *Id.* at 4.

[15] Mr. Wilson sent BOR letters to at least Bridges Group, Arrow Dynamics, Kelly Products, Farmview, Burgess Pigment Company, Mission Healthcare, The ARC Macon, Family Hospice, RSDH Andy's Pool, Howard Reed Enterprise, and Fincher's BBQ. *See* Doc. 37-2.

Mr. Leskosky could pitch Sanford to the other ASP pool companies.  Doc. 35-2 at 139–40.  Mr. Wilson also asked Ryan Eiland of CRC Pool Service to talk to one Nick Carver and let Mr. Carver know Mr. Wilson had moved to Sanford "and all he has to do is reach out to me to make the switch."  Doc. 35-16 at 2.[16]  These are instances of at least indirect solicitation, prohibited by the contract.  *See* Doc. 35-13 at p. 8 ¶ 8(a)(iii).

Before leaving McGriff, Mr. Wilson told Mike Kaplan, a former McGriff co-worker who had moved to Sanford in 2020, Doc. 35-4 at 11, that he was going to try to get BOR letters from current McGriff clients.  *Id.* at 77.  That is an admission of solicitation with intent to do business.  And Mr. Wilson admits he "crossed the line" and did not comply with his non-solicitation restrictions in his dealings with a representative of S-Squared Management, Steven Stembridge.  Doc. 35-2 at 87; *see also* Doc. 35-16 at 5 (text to Mr. Stembridge that "I want you back as a client as you are one of only 2 clients yet that has not come over."  Doc. 35-16 at 5; Doc. 39-5 (identifying Stembridge)).  That is solicitation.

In response to this evidence, Mr. Wilson submits very little.  He raises disputed questions of fact as to three customers, MS Corporation, Sunbelt Environmental Services, and Mission Healthcare.[17]  But beyond these three, Mr. Wilson points to no evidence as to any individual customer that rebuts or contradicts McGriff's evidence.

---

[16] Nick Carver was Mr. Wilson's contact for Carver Eiland Pool Service LLC when Mr. Wilson worked with McGriff.  Doc. 39-5.

[17] McGriff acknowledges that MS Corporation is not included on any of Mr. Wilson's target lists.  Doc. 42 at 22 n.8.  And Mr. Wilson did not testify that he reached out to this company before leaving McGriff nor has either party identified a BOR letter sent to MS Corporation by Sanford.  As to Sunbelt, Mr. Wilson testified that he did not tell Sunbelt he was leaving McGriff.

18

At his deposition, he testified in general terms that he did not solicit any McGriff customers, Doc. 35-2 at 220–21, but he never denied contacting specific customers; he repeatedly said only that he did not recall doing so. *Id.* at 109. While he was not completely clear in his testimony, a jury might possibly infer that he only told customers how to move their business to Sanford if a customer asked him. *See, e.g.*, *id.* at 109–10. Assuming without deciding that is so, nowhere does he point to any specific evidence disputing that he contacted numerous McGriff customers to tell them he was leaving McGriff for Sanford with the intent to take his business with him and in hopes that they would ask him how switch brokers; in fact, he admits that. That is solicitation prohibited by the contract and constitutes a breach of contract.

On this record, no reasonable jury could find that Mr. Wilson did not "directly or indirectly solicit, contact, divert, or call upon" current McGriff customers "with the intent of doing business with" those customers "on behalf of any competitive business." *See* Doc. 35-13 at ¶ 8(a)(iii) (cleaned up). As to all customers identified herein other than MS Corporation, Sunbelt, and Mission Healthcare, McGriff has shown without dispute that there was a valid contract prohibiting Mr. Wilson from soliciting those customers, that Mr. Wilson solicited those customers, and that in doing so Mr. Wilson breached this

---

Doc. 35-2 at 107. And in his signed declaration, he states that his contact at Sunbelt reached out to him in January 2023 to request a quote from Sanford to compare with a quote from McGriff. Doc. 43-2 at ¶¶ 19–24. As to Mission Healthcare, Mr. Wilson testified that a Mission employee contacted Mr. Wilson asking for a BOR letter before he sent the letter. Doc. 35-2 at 134. There is evidence that Mr. Wilson texted Paul Verhoeve, CEO of Mission, *id.* at 149, on November 7, 2022, about switching to Sanford, Doc. 35-16 at 108, but this does not negate the possibility that Mission reached out to Mr. Wilson before he sent this text after learning he had moved companies.

contractual obligation. McGriff is entitled to summary judgment on this claim as to all customers except MS Corporation, Sunbelt Environmental Services, and Misson Healthcare.

Mr. Wilson says that it is not solicitation to contact customers and tell them he is moving to a different employer. *See* Doc. 39 at 15–17. First, he cites no North Carolina law to support this proposition. Second, even assuming that is so, he ignores that the contract prohibits more than solicitation. *See Aeroflow Inc. v. Arias*, No. 11-CV-1652, 2011 WL 2651567, at *8 (N.C. Super. July 5, 2011) (interpreting the prohibition on solicitation of customers by reference to specific contract language). It also prohibits him from "contact[ing]" and "call[ing] upon" McGriff customers "with the intent of doing business" with those customers on behalf of Sanford. Doc. 35-13 at p. 8 ¶ 8(a)(iii). It is undisputed that he contacted these customers with that intent. His own texts prove it.

Mr. Wilson also contends that the evidence "falls short of solicitation" for many of the clients who made a switch to Sanford and that there is an "evidentiary vacuum" for clients he refers to as "Pool Clients." Doc. 39 at 14–15. But as previously explained, "the record taken as a whole," *Scott v. Harris*, 550 U.S. 372, 380 (2007), and in the light most favorable to Mr. Wilson, provides an abundance of evidence that Mr. Wilson solicited these clients. Mr. Wilson's evidence, such as it is, does not create a disputed question of fact.

Summary judgment on Count I: Breach of Contract – Solicitation of Customers, Doc. 2 at ¶¶ 57–65, will be granted in McGriff's favor as to all customers identified herein except MS Corporation, Sunbelt Environmental Services, and Mission Healthcare.

As to those three customers and any others not specifically discussed in this order, summary judgment is denied, and the question of breach will be for trial. Damages as to all customers also will be for trial.

### 3. Confidentiality Provision

Paragraph 11 of Mr. Wilson's employment agreement covers confidentiality. *See* Doc. 35-13 at pp. 9–10 ¶ 11. During his employment with McGriff and "for a period of three years following the date of voluntary or involuntary termination," Mr. Wilson was prohibited from (1) misappropriating, (2) using for the purpose of competing with McGriff, either directly or indirectly, (3) disclosing to any third party, either directly or indirectly, or (4) aiding anyone else in disclosing to any third party, McGriff's confidential information. *Id.* at pp. 9–10 ¶ 11(a).

"Confidential information" includes customer information like "customer lists, contracts, information, requirements, billing histories, marketing methods, needs and products or services provided by [McGriff]" and financial information like "financial statements, balance sheets, profit and loss statements, earnings, commissions, and salaries paid to employees, sales data and projections, cost analyses and similar information." *Id.* at p. 10 ¶ 11(b). Mr. Wilson does not challenge the enforceability of the contract provision prohibiting disclosure of confidential information.

Both parties have moved for summary judgment. The evidence viewed in the light most favorable to Mr. Wilson shows that he breached the confidentiality provision found in his employment agreement with McGriff.

While he was still employed with McGriff, Mr. Wilson repeatedly sent Sanford information about McGriff customers and their current insurance carriers. *See supra* notes 12–14; Doc. 35-16 at 40 (text thread in effect telling Sanford to develop a relationship with Hanover, an insurer, to be able to bring in business from McGriff customer "ARC" and providing a revenue amount).[18] In September 2022, he specifically asked via text for "an update on each of these accounts … which markets do you NOT have yet" and attached photos listing McGriff customers and their respective insurance carriers. Doc. 35-4 at 18, 23–24.[19] After he left McGriff and joined Sanford, Mr. Wilson shared with another Sanford employee a photo of a handwritten list containing customers he had at McGriff, the estimated revenue associated with those customers, and the months in which their policies were up for renewal. *See* Doc. 36-4 at 2 (photo); Doc. 35-2 at 211–13 (testimony by Mr. Wilson that he shared this list with Carrie McKinney after she joined Sanford). It is also undisputed that he posted McGriff client account information on whiteboards in his Sanford office, Doc 36-3, and that this confidential information was seen by Sanford employees. Doc 35-4 at 107 (deposition testimony of Mike Kaplan that he saw the whiteboard but did not pay attention to it); Doc 35-5 at 92,

---

[18] In response to an August 26, 2022, text from Sanford asking "who and why Hanover?" Mr. Wilson responded "ARC. 15k rev. Have to have it done mid-November because board meets early to approve." Doc. 35-16 at 40 (cleaned up). ARC was a customer of McGriff associated with Mr. Wilson, Hanover was the associated market, and "15k rev" must refer to the amount of revenue generated from the account. Doc. 35-4 at 23 (CM/ECF pagination) (listing ARC and Hanover together); Doc. 36-4 at 2 (listing "14" beside "ARC Macon" as estimated revenue).

[19] The list included at least some customers Mr. Wilson had while at McGriff. *See* Doc. 39-5; *see also* Doc. 35-4 at 23 (CM/ECF pagination) (including Mercer, Sellers, and Pyrotechnics); Doc. 35-16 at 55 (March 2022 text messages listing Mercer, Sellers, and Pyrotechnics as customer accounts associated with specific markets).

22

97 (testimony of Carson Schilling that he saw the information on the whiteboard); Doc 35-6 at 53 (testimony of Carrie McKinney that she has "seen his whiteboard with a list of clients"). The customer accounts and their associated information fall under the definition of "confidential information." *See* Doc. 35-13 at p. 10 ¶ 11(b) (defining customer lists as confidential).

Mr. Wilson denies under oath that he shared any confidential information with Sanford. Doc. 35-2 at 221. But one cannot tell from this cursory denial in response to a leading question if he is denying that customer information is confidential, denying that he sent any of the material texts communicating that information, or some other fact, or if he just doesn't understand what confidential information means. In the face of overwhelming detailed evidence that he has not directly contradicted, that conclusory assertion does not create a disputed question of material fact. Mr. Wilson breached the confidentiality provision in his employment agreement by sharing customer information with Sanford employees.

Beyond this, however, there are disputed questions of material fact. It is undisputed that during his last months of employment Mr. Wilson compiled and collected a great deal of other confidential information belonging to McGriff, including a McGriff Management Reporting Package that Mr. Wilson emailed to himself in October. Doc. 35-2 at 184–85.[20] A jury could find that he used the information to compete with McGriff or

---

[20] The information also includes over 50 pictures of the McGriff MiDash database, Doc. 36-1, which contains lists of McGriff clients and their account information, Doc. 35-10 at ¶ 10, the McGriff Management Reporting Package, Doc. 36-2, which contains confidential information

23

shared the information with third parties, or both, in violation of his employment agreement, and certainly there is evidence to support these inferences. But a jury might possibly credit Mr. Wilson's testimony that he did not share the information with anyone else and that he obtained the information for legitimate reasons, such as to review his clients while working at McGriff and to weigh his options when deciding whether to move to Sanford.[21]

Summary judgment on Count III: Breach of Contract – Confidentiality, Doc. 2 at ¶¶ 77–83, will be granted for McGriff to the extent that Mr. Wilson shared confidential customer information through text message, handwritten lists, and his Sanford office whiteboards. McGriff must still prove its damages as to these breaches. As to other

---

about McGriff producers and offices, Doc. 35-10 at ¶ 21, and account information from McGriff's client management system, Sagitta. Doc. 35-2 at 190–91; *see also* Doc. 35-10 at ¶ 10.

[21] McGriff does not share the Management Reporting Package with all employees, and the information it contains is not generally known outside of McGriff. Doc. 35-10 at ¶ 21. The report was shared with Mr. Wilson by McGriff. Doc. 36-2 at 2. He testified that he emailed the report to his wife's email address so that he could review the information at home but that he did not share the information with anyone else, including anyone at Sanford. Doc. 35-2 at 184–86.

Mr. Wilson further testified that he contacted Josh James, another McGriff producer, to access McGriff's client management systems Sagitta because Mr. Wilson needed information about his clients. *Id.* at 190–94. He said he did not share the information with anyone else and only used Mr. James' access because he never got a passcode for the system. *Id.* at 192–94. When Mr. Wilson accessed Sagitta, he was still employed at McGriff. *See* Doc. 35-16 at 9–10 (text messages between Mr. Wilson and Mr. James).

Mr. Wilson testified that he used the photos he took of MiDash to weigh his options when deciding to move to Sanford. Doc. 35-2 at 196–99. He took the photos while still employed at McGriff. *See, e.g.*, Doc. 36-1 at 61 (photo dated 8/25/2022). Mr. Wilson still had the photos on his phone at the time he was deposed, Doc. 35-2 at 197, but he testified that he has not looked at them since going to Sanford or shared the information with anyone else. *Id.* at 197–98.

24

breaches of the confidentiality provision asserted by McGriff, summary judgment is denied.

## V.    Breach of Fiduciary Duty of Loyalty

McGriff contends that Mr. Wilson had a fiduciary duty to McGriff as both an agent and company official and that he breached that duty by sharing McGriff's confidential information and by recruiting McGriff customers and employees to move to Sanford while he was still employed at McGriff.[22]  Mr. Wilson contends that he was merely an employee of McGriff so he did not have a fiduciary duty to the company and that even if he did, he did not breach that duty.

Both parties move for summary judgment.  They again disagree about whether Georgia or North Carolina law applies, but neither party has identified a material difference in the law in the briefing.  To prove a claim for breach of fiduciary duty under North Carolina or Georgia law, a plaintiff must show (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages proximately caused by the breach.  *Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga. App. 587, 594, 726 S.E.2d 779, 787 (2012); *Chisum v. Campagna*, 376 N.C. 680, 706, 855 S.E.2d 173, 192 (2021).

If Mr. Wilson had a fiduciary duty to McGriff, it would be a breach to solicit and recruit customers and employees and to share confidential information while employed

---

[22] In its complaint, McGriff labels the claim as one for a breach of the duty of loyalty, alleging that Mr. Wilson breached the duty by recruiting McGriff employees to leave their employment and join a competitor and by taking McGriff's confidential and proprietary information for his benefit and the benefit of a competitor.  Doc. 2 at ¶¶ 84–88.  This is essentially a breach of fiduciary duty claim.

25

by McGriff.  To the extent McGriff has obtained summary judgment on other claims based on those actions, as discussed *supra*, it is entitled to have those facts taken as decided for purposes of the breach of fiduciary duty claim.  Otherwise, however, breach is a disputed question of fact, again to the extent discussed *supra*.

Whether there is a fiduciary relationship is a disputed question of fact.  The relationship of employer-employee by itself is not enough to establish a fiduciary relationship.  *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 708 (2001); *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 269 Ga. 604, 607, 503 S.E.2d 278, 281–82 (1998); *accord Cellofoam N. Am. Inc. v. Kustes*, No. 19-CV-2159, 2021 WL 9274549, at *5–6 (N.D. Ga. Dec. 21, 2021).  But the facts of a particular case can establish the existence of a fiduciary relationship between an employee and employer.  *See Dalton*, 353 N.C. at 651–52; *McLane*, 269 Ga. at 607; *see also Wright*, 315 Ga. App. at 592 (noting that a fiduciary relationship can be created by law or fact); *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599, 821 S.E.2d 711, 725 (2018) (same).

A jury must decide whether Mr. Wilson owed a fiduciary duty to McGriff.  Summary judgment on Count IV:  Breach of the Duty of Loyalty/Fiduciary Duty, Doc. 2 at ¶¶ 84–88, is denied.

## VI.    Conversion

McGriff alleges that Mr. Wilson accessed and stole confidential information while employed by McGriff.  *See id.* at ¶¶ 90–91.  Mr. Wilson moves for summary judgment contending that the conversion claim is governed by Georgia law and thus preempted by Georgia's Trade Secrets Act.  McGriff does not dispute that its conversion claim should

26

be dismissed. *See* Doc. 45 at 13; *see also* Doc. 42 (McGriff's response which does not include discussion of the conversion claim). Summary judgment on Count V: Conversion, Doc. 2 at ¶¶ 89–93, will be granted for Mr. Wilson.

## VII. Misappropriation of Trade Secrets

Both parties move for summary judgment on McGriff's misappropriation of trade secrets claim. *Id.* at ¶¶ 94–103. McGriff contends that Mr. Wilson misappropriated the company's trade secrets by writing down and capturing confidential information including company-wide financial data, employee information, and client lists, and by sharing this information with Sanford for his own benefit and the benefit of Sanford. Doc. 35 at 36–38. Mr. Wilson contends that the information at issue does not meet the definition of trade secrets and that McGriff cannot show Mr. Wilson disclosed the information or misappropriated it. Doc. 39 at 30–32.

The parties also dispute the applicable law. McGriff asserts this claim under the North Carolina Trade Secret Protection Act. *See* Doc. 2 at ¶¶ 94–103. Mr. Wilson contends that Georgia law applies because the alleged misappropriation took place in Georgia and that McGriff cannot sustain a claim brought under the North Carolina TSPA. Doc. 39 at 29–30. McGriff has also moved to amend its complaint to assert a misappropriation claim under Georgia's relevant law. Doc. 33. Mr. Wilson contests the motion. Doc. 41.

Nothing in the North Carolina statute limits its application to situations where the party engaged in misappropriation is physically present in North Carolina.[23]  Mr. Wilson points to no case that says a North Carolina business cannot use the North Carolina TSPA to protect its work-related trade secrets, especially when there is evidence those trade secrets were largely maintained electronically on computer servers in North Carolina.[24]

---

[23] As noted in the Restatement of Conflicts of Law, § 6(b), when

> faced with the question [of] whether the issue before it falls within the intended range of application of a particular statute[, t]he court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect . . . When the statute is silent as to its range of application, the intentions of the legislature on the subject can sometimes be ascertained by a process of interpretation and construction. Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.

*See* Restatement (Second) of Conflicts of Laws § 6(b) cmt. b; *see generally*, *Sawyer v. Mkt. Am., Inc.*, 190 N.C. App. 791, 795–97, 661 S.E.2d 750, 753–54 (2008) (evaluating the range of application for North Carolina's Wage and Hour Act).  A choice of law provision in a contract is relevant to this discussion as well.  *See, e.g.*, *Troublefield v AutoMoney, Inc.*, 284 N.C. App. 494, 506–07, 876 S.E.2d 790, 800–01 (2022).

[24] Mr. Wilson cites *Lloyd v. Carnation Co.*, 61 N.C. App. 381, 301 S.E.2d 414 (1983), for the proposition that a North Carolina statute cannot be constitutionally applied in Georgia, Doc. 45 at 13, but that case is distinguishable.  In that case, if the defendants did the acts supporting the claim, "the acts were done entirely within the State of Virginia."  *Lloyd*, 61 N.C. App. at 387–88.  Here the alleged trade secrets were maintained in North Carolina, and the plaintiff had to access them in North Carolina.  Doc. 35-10 at ¶ 9.

The situation also differs from that in *Sawyer*, where a non-resident plaintiff who worked in another state attempted to recover damages under North Carolina's Wage and Hour Act.  *See* 190 N.C. App. at 797.  And the facts here differ from the facts in cases where courts have declined to allow a party to pursue a claim because of a statute's extraterritorial limitations.  *See, e.g.*, *Poudel v. Mid Atl. Pros., Inc.*, No. 22-CV-1400, 2024 WL 3818135, at *4 (4th Cir. Aug. 15, 2024) (holding non-residents who did not work or live in Maryland could not pursue action for violation by Maryland based company of Maryland's labor and employment laws); *Volvo Grp. N. Am., LLC v. Roberts Truck Ctr., Ltd.*, No. 19-CV-2981, 2020 WL 1701686, at *6 (N.C. Super. Apr. 8, 2020) (finding Kansas-based truck dealer could not rely on North Carolina statute governing motor vehicle dealerships because the law cannot regulate dealer agreements solely

28

Mr. Wilson also agreed North Carolina law would apply to any issues arising out of the performance of his contract. *See* Doc. 35-13 at p. 12 at ¶ 17. The contract provides that for any confidential information that also meets the definition of a trade secret under the applicable law, Mr. Wilson must "act in accordance with the terms of applicable law governing trade secrets." *Id.* at pp. 9–10 ¶ 11(a). On these facts, there is nothing unfair or unreasonable about allowing McGriff to proceed under the North Carolina statute, nor would such application extend the statute beyond its territorial reach.

Under North Carolina's TSPA, a person misappropriates a trade secret by acquiring, disclosing, or using the trade secret of another without express or implied authority or consent. N.C. Gen. Stat. § 66-152(1). To establish misappropriation of a trade secret, the plaintiff must show that the defendant "(1) knows or should have known of the trade secret, and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed or used it without the express or implied consent of the owner." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658, 670 S.E.2d 321, 328 (2009) (quoting N.C. Gen. Stat. § 66-155). Here, there are disputed questions of material fact as to what information constitutes a trade secret, whether Mr. Wilson acquired some of the information without consent, and whether he disclosed or used other such information. A jury will need to decide. Summary judgment on Count VI: Misappropriation of Trade Secrets, Doc. 2 at ¶¶ 94–103, will be denied for both parties.

---

governing sales made outside the state by dealers that do not do business and are not licensed in North Carolina. McGriff is a North Carolina plaintiff pursuing a North Carolina cause of action based partially on evidence that is stored in and accessed from the state.

McGriff's motion to amend the complaint to add a claim under the Georgia Trade Secret Protection Act, Doc. 33, will also be denied. The plaintiff did not seek to amend its complaint until well after the deadline in the scheduling order, and it has not shown good cause for the late amendment.

## VIII.   Unfair and Deceptive Trade Practices

McGriff and Mr. Wilson both move for summary judgment on McGriff's unfair and deceptive trade practices claim. *See* Doc. 2 at ¶¶ 104–110. Mr. Wilson contends that Georgia law applies to this claim and thus McGriff cannot pursue the claim under a North Carolina statute. Doc. 39 at 32. McGriff contends that North Carolina law applies, Doc. 42 at 30–31, and that on the merits it is entitled to summary judgment. Doc. 35 at 40–42.

For reasons already discussed in connection with McGriff's claim for misappropriation of trade secrets, *see supra* at 27–29, McGriff can also pursue a claim under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1. McGriff is headquartered in North Carolina, maintains its bank accounts in North Carolina, and has all its customer checks sent to North Carolina to be deposited in those accounts. Doc. 35-10 at ¶ 4. McGriff's Chapter 75 claim does not present issues of extraterritorial application of a state statute. That is especially true here, where Mr. Wilson agreed that North Carolina law would govern disputes over the performance of his employment agreement, Doc. 35-13 at p. 12 ¶ 17, and McGriff felt any financial injury from Mr. Wilson's actions in North Carolina. *See Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589–90, 581 S.E.2d 68, 76 (2003) (stating an unfair and deceptive trade practices claim requires plaintiff incur actual damages).

30

Although McGriff can pursue this claim, summary judgment is not warranted for either party. For a Chapter 75 claim, a plaintiff must show: "(1) an unfair or deceptive act or practice by the defendant, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 382, 781 S.E.2d 889, 892 (2016) (cleaned up).

Mr. Wilson did not comply with his employment contract, but a breach of contract, even if intentional, is not enough to find a defendant engaged in an unfair and deceptive trade practice. *Johnson v. Colonial Life & Accident Ins. Co.*, 173 N.C. App. 365, 370, 618 S.E.2d 867, 871 (2005). However, a breach of contract may give rise to an unfair and deceptive trade practice when accompanied by egregious or aggravated circumstances. *See Garlock v. Henson,* 112 N.C. App. 243, 245–46, 435 S.E.2d 114, 115–16 (1993). For example, "a breach of fiduciary duty amounts to constructive fraud," *Compton v. Kirby*, 157 N.C. App. 1, 16, 577 S.E.2d 905, 914 (2003), and fraud is usually sufficient to support a conclusion that an action was unfair or deceptive as is a violation of the TSPA. *See Turpin v. Charlotte Latin Schs., Inc.*, 900 S.E.2d 352, 366 (N.C. App. 2024) (discussing fraud); *Ridgway*, 194 N.C. App. at 659 (discussing TSPA).

While there is substantial evidence of aggravating facts, it is the better practice to resolve the claim at trial, given the disputed questions identified herein. Summary judgment as to Count VII: Unfair and Deceptive Trade Practices, Doc. 2 at ¶¶ 104–110, will be denied.

31

## IX. Conclusion

Summary judgment will be granted for Mr. Wilson on McGriff's conversion claim. Summary judgment on the breach of contract claims will be granted in part for McGriff, as the evidence viewed in the light most favorable to Mr. Wilson shows that he breached his employment contract by sharing confidential customer lists and information with Sanford employees and by recruiting certain McGriff employees and customers to leave McGriff and move to Sanford. As to all other claims, there are disputed questions of material fact and summary judgment will be denied.

The motion to amend will be denied. McGriff filed this motion well after the deadline set in the scheduling order and well after learning of any new facts relevant to the motion. McGriff has not shown good cause.

It is **ORDERED** that:

1. The plaintiff's motion to amend the complaint, Doc. 33, is **DENIED**.

2. The plaintiff's motion for partial summary judgment, Doc. 34, is

    **GRANTED in part:**

    a. The plaintiff is entitled to summary judgment on Count I: Breach of Contract – Solicitation of Customers, Doc. 2 at ¶¶ 57–65, as to breach for all identified customers except MS Corporation, Sunbelt Environmental Services, and Mission Healthcare; as to these three customers and any other customers not identified specifically herein, summary judgment is denied.

b. The plaintiff is entitled to summary judgment on Count II: Breach of Contract – Solicitation of Employees, Doc. 2 at ¶¶ 66–76, as to breach arising from the defendant's solicitation of Carson Schilling, Jim Wilson, Josh James, Jimmy Hinson, Katrina Sidlauskas, Carrie McKinney, Tom Flythe, Debbie Wallace, and Jessica Foskey; as to any other employees not identified specifically herein, summary judgment is denied.

c. The plaintiff is entitled to summary judgment on Count III: Breach of Contract – Confidentiality, Doc. 2 at ¶¶ 77–83, to the extent that the defendant shared confidential customer information through text messages, handwritten lists, and his Sanford office whiteboards; as to any other alleged breach of the confidentiality provision, summary judgment is denied.

d. The plaintiff's motion is otherwise **DENIED.**

3. The defendant's motion for summary judgment, Doc. 38, is **GRANTED in part:**

a. The defendant is entitled to summary judgment on Count V: Conversion, Doc. 2 at ¶¶ 89–93.

b. The motion is otherwise **DENIED.**

This the 10th day of January, 2025.

_____

UNITED STATES DISTRICT JUDGE

34